Commonwealth of Massachusetts

Superior Court of Middlesex County

1

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

JUN 2 2 2015

CLERK

Daniel E. Sullivan, III

Plaintiff

Civil Action 15-4606

V.

No. _____

Inge G. Thulin
Chairman of the Board, President and Chief Executive Officer
3M Company and 3M Electronic Monitoring

Defendant

## COMPLAINT

### Parties

1. The Plaintiff, Daniel E. Sullivan, III, was a resident of 38 Cape Cod Avenue

   Plymouth, Plymouth County, Massachusetts, 02345, and now is a resident of 2 South

   Gateway Winchester, Middlesex County, Massachusetts, 01890, a citizen of the

   United States of America, and was resident of Massachusetts during all times relevant

   to this Complaint.

2. The Defendant, Inge G. Thulin, as Chairman of the Board, President and CEO, and

   3M Company and 3M Electronic Monitoring, are headquartered at 3M Center, St.

   Paul, MN.

### Introduction

1. Daniel E. Sullivan, III, of Winchester Massachusetts, hereby asserts the following facts

   and claims against the defendants in the above-entitled action:

(1) Product Liability

(2) Negligence

(3) Chapter 93A

(4) Misrepresentation

Jurisdiction

1. Jurisdiction of this Court a rises under Massachusetts General Laws regarding
constitutional, federal law, state law and state torts.

Statement of Facts

I. BACKGROUND FACTS

1. On March 1, 2012, Plymouth District Court Christopher Welch revised and revoked his
sentence of Mr. Sullivan to supervised probation; a mental health evaluation; certified
batterer's intervention program; 100 yard no contact and stay away from complainant;
and applicable or related fees or assessments.

2. Through my counsel, the now Honorable William "Bill" F. Sullivan, of the Superior
Court of the County of Worcester, Massachusetts, (William Sullivan has no relation to
Daniel Sullivan); I requested that I be fitted with a GPS bracelet to ensure my safety,
security and liberty.

3. Judge Welch added the GPS bracelet as a condition of my probation per my request
through my counsel.

4. Plymouth District Court Probation Department reported to Judge Welch that they did not
have access to a "functioning" or "operable" or 'working" GPS bracelet.

5. Plymouth District Court assessed me a $5.95 per day fee for the GPS during the
probation period—which endured from March 2, 2012 through December 8, 2014.

6. On March 2, 2012, I was assigned Melissa Melia as my probation officer.

7. While I was wearing the Motorola-branded GPS bracelet, I experienced no issues, malfunctions or defects with the product.

8. On or about March 25, 2012, the Commonwealth of Massachusetts's Probation Department's Electronic Monitoring Program (ELMO) replaced the Motorola-branded GPS bracelet that I was wearing with a 3M™ One-Piece GPS Offender Tracking System.

9. ELMO and Probation claimed individually and publicly that the 3M™ product was substantially more reliable than the Motorola product.

10. During or about the weeks of June 04, 2012 through June 22, 2012, the 3M™ One-Piece GPS Offender Tracking System began to malfunction continuously. The GPS would not hold a GPS signal or charge, and I contacted ELMO to report the malfunction. ELMO ordered me to replace the charger at District Court. The malfunctioning persisted. ELMO was unsuccessful in resetting the GPS, and ordered me to replace the defective GPS with a 3rd GPS at District Court.

11. On June 6, 2012, during a regular supervised visit with Melia, she said that her Chief Probation Officer, Timothy C. Norris, wanted to speak with me in his office.

12. Norris began yelling and threatening me: "You're a very bad guy and you're lucky you're not in jail… if it was up to me you would be left in jail for a long time… you're lucky you got Bill Sullivan (my attorney) on your side, but he won't always be there to help you… you need to keep your GPS fully charged all the time."

13. I responded, "I'm charging the GPS 8 hours a day even though ELMO and 3M say it only needs to be charged 2 hours a day."

14. Norris responded, "That's not my problem… it's yours… we got thousands of these out there and we have no problems with them."

15. I responded, "I can't speak to others… I can only say I'm charging the GPS 8 hours a day."

16. Norris responded, "I don't think you think this is a serious matter… you're a very bad guy and the GPS is the only thing keeping you out of jail… do you understand me?"

17. I responded, "Yes sir."

18. During or about the week of October 10, 2012, the 3M™ One-Piece GPS Offender Tracking System began to malfunction continuously. The GPS would not hold a GPS signal or charge, and I contacted ELMO to report the malfunction. ELMO reported that my GPS signal was pinged at the Lahey Clinic and Medical Center in Burlington, Massachusetts, for "the past week or so." This was erroneous. ELMO was unsuccessful in resetting the GPS, and replaced the defective GPS with a [4th] GPS at a public place.

19. During or about the week of April 15, 2013 through April 22, 2013, the 3M™ One-Piece GPS Offender Tracking System began to malfunction again. The GPS would not hold a GPS signal, and I contacted ELMO to report the malfunction. ELMO reported that my GPS signal was pinged in the Town of Watertown, Massachusetts, which was impossible as the Town of Watertown was under siege and blockaded due to the hunt for the Boston Marathon bombers. ELMO asked me to "deal with the defective product next week," on April 23, 2013—when ELMO replaced the defective GPS with a [5th] GPS street-side in plain view of the general public in front of Woburn District Court in Woburn, Massachusetts.

20. On December 8, 2014, Melissa Melia charged me $15.00 because the charger for GPS bracelet was not in working condition.

II. FACTS

1. On June 22, 2012, at 9:06am, Melissa Melia called me on my cell phone while I was on a 9:00am sales conference call with my employer, and requested that I appear at Plymouth District Court Probation Department immediately.

2. I was parked in the parking lot of the Winchester, Massachusetts Public Library.

3. I asked Melia "Is there a problem?"

4. Melia responded, "Don't give me that bullshit. You know why I'm calling."

5. I responded, "I have no idea what you are talking about."

6. Melia responded, "Don't give me any bullshit… just get down here now."

7. I immediately drove from Winchester, Massachusetts to Plymouth, Massachusetts—making the 50 mile drive through rush-hour traffic.

8. While making the drive, I contacted my counsel, the now Honorable William F. Sullivan, and told him that, "Melia called me, sounded angry and I think she wants to violate me."

9. The Honorable Sullivan responded, "I think you're worried about nothing, you haven't down anything to violate your probation."

10. I responded, "Bill, you weren't on the call, I was and Melia sounds angry."

11. The Honorable Sullivan responded, "Call my office when you find anything out… I'm in court all day so Melia can't do anything I until I'm present… I'm your attorney and Melia knows that."

12. I responded, "Okay… I will update as soon as I know something."

13. Continuing along the drive, I contacted Thomas O'Gorman, my brother-in-law, Carolyn
    Sullivan O'Gorman, my sister, Kathleen Sullivan Flynn, my sister, and Susan Costello,
    my girlfriend, to ask each if they could join me at Plymouth District Court Probation
    Department. I expressed my concern that Melia was looking for any excuse to violate me
    and throw me in jail. Each of them responded that they had work commitments and
    therefore could not meet me at Plymouth District Court.

14. When I reported to Plymouth District Court Probation Department, Melia ordered me to
    sit in the Arraignment Court until she said she "was good and ready."

15. I asked Melia, "What is the matter?"

16. Melia responded, "ELMO called you 30 to 40 times last night and you didn't answer. I
    called you too."

17. I responded, "I never received any calls from ELMO or you… What number did you
    call?"

18. Melia responded, "Don't play games with me."

19. I responded, "I'm not playing games… you are aware that ELMO and Probation has been
    confusing me with another Daniel Sullivan from East Boston, Massachusetts, for the past
    4 months."

20. Melia responded, "That's not my problem… it's yours."

21. Melia responded, "I'm not in the mood for your bullshit… You know what you did…
    Now go down to the Arraignment Court and wait until your name is called."

22. I went down stairs of the courthouse and printed out my Verizon cellular call history for
    the past week. I only had a cellular phone. I did not have a landline.

23. There were no phone calls from ELMO and Probation to me.

24. I went upstairs and handed Melia the printout of my Verizon cellular call history, and said, "Please check my phone log... there are no calls from ELMO, probation or you on it... Are you sure you were calling me and not someone else?"

25. Melia responded, "I don't need to see this (my phone log)... it doesn't change anything."

26. While sitting in Arraignment Court, I contacted my counsel, the Honorable Sullivan, and his office secretary said, "Bill is in court all day... I will notify the court that your attorney is in court all day and I ask for a delay of any proceeding until Bill (my attorney) can be present... don't worry... please call once you find out what is the matter."

27. I responded, "Okay."

28. I contacted Susan Costello, my girlfriend, to update my status.

29. At about 11:00am, Melia entered Arraignment Court and asked Judge Brian Gilligan "to hold me in violation of my probation."

30. Judge Gilligan ordered me to be held in custody until a hearing on the matter later in the day.

31. A court officer placed me in handcuffs, took me into custody and placed me in a holding cell in the basement of the courthouse.

32. At about 2:20pm, Melia argued to Judge Gilligan that: "I was currently in surrender status for his failure to comply with his GPS, his failure to keep his GPS unit in working order, his non-compliance with his GPS... that his GPS battery was dead at 2:04am, and that Chief's warrant was issued at 3:36am, that Mr. Sullivan has failed to keep the GPS battery charged at all times, that probable cause be found , and that Mr. Sullivan be held pending final surrender... that he knows what he needs to do and he's not doing it... that

I have discussed this issue with (Probation) Chief (Timothy C.) Norris back on June 6 and we told him what is needed..."

33. StacyAnn L. Slauson, an attorney, was pulled out of the court lobby to defend me as my attorney of record, the Honorable William F. Sullivan, contacted the Court to inform the Court that has at trial on another case in another courthouse. Slauson had no knowledge of my case, and we never met or had contact prior to this hearing.

34. In her defense of me, Slauson stated: "That GPS device is new to probation and my client, that there appears to be a problem with the charging mechanism on the GPS, that my client denies receiving any call from ELMO or probation, that I have a copy of his phone log that shows no calls from ELMO or probation, and I believe that the probation officer does in fact have a copy of phone logs."

35. Melia responded, "I actually don't have that from today, but I can speak to the phone calls... that electronic monitoring made numerous phone calls over night... that his home phone is disconnected... that I attempted to call him on his cell phone but it went straight to voicemail which was full."

36. Melia perjured herself to Judge Gilligan. Melia denied having a copy of my phone log even though I handed her a copy just 3 hours prior.

37. Melia stated that "Mr. Sullivan's home phone is disconnected." Melia knew on the previous March 2 that I only had a cellular phone which was in compliance with probation.

38. Judge Gilligan asked Melia: "Was there something problematic with the battery on June 6?"

39. Melia responded, "Yes... that was on June 6... it is the same unit... Mr. Sullivan was warned by Chief Norris and me about the importance of complying with the GPS and charging the GPS... he knew what he had to do..."

40. Judge Gilligan found probable cause to hold me for a final surrender hearing and said, "Give him a short date."

41. Melia responded, "I'm going on vacation next week, so could we set a date for sometime in July."

42. Judge Gilligan said, "No... make it next Wednesday."

43. On June 27, 2012, Melia asked Judge Rosemary Minehan to "impose a curfew 11:30pm to 5:00am, otherwise same conditions to stand."

44. Judge Minehan so ordered the curfew, and I was released from jail.

45. As a result of the false, malicious, defamatory, deceitful, harmful or damaging testimony by Melia referenced above in Sections I and II, acting under the color of law and in her individual capacity, Melia violated my constitutional and civil rights under Title 42 of the U.S. Code sec. 1983—Civil Action for Deprivation of Rights; Title 42 of the U.S. Code sec. 1985—Conspiracy to Interfere with Civil Rights; and Title 42 of the U.S. Code sec. 1981—Equal Rights Under the Law; and state tort law and state civil rights law.

46. And consequently, I was wrongfully deprived or denied my federal, constitutional and statutory rights to liberty and pursuit of happiness, and consequently damaged by loss of time; economic or financial loss; health and medical expenses; impairment of employment offers and opportunities; impairment of educational offers and opportunities; impairment of earning capacity; pain and suffering; emotional distress; loss of

consortium; and other actual, compensatory, consequential punitive and/or exemplary damages.

III. FACTS DISCOVERABLE IN DISCOVERY PHASE

1.  Plaintiff attached a copy of Notice of Probation Violation and Hearing.

2.  Plaintiff attached a copy of his Verizon Cellular Phone Log for the time in question to validate that no phone call was placed by ELMO, Probation Department or Melia to my one and only telephone number.

3.  Plaintiff attached a copy of the Massachusetts Probation Service Electronic Monitoring Program Fact Sheet 2014.

4.  Plaintiff attached copies of news excerpts of Superior Court Judge Heidi Brieger—who banned the use of GPS bracelets in her court due to "serious problems and flaws with the ELMO system."

5.  Additional evidence and testimony will be presented during Discovery and /or at Trial.

Statement of Claims

COUNT 1: PRODUCT LIABILITY

1.  Plaintiff repeats and re-alleges and incorporates by reference the facts aforementioned above with the same force and effect as is herein set forth.

2.  The defendant markets and sells through its corporate website, corporate press releases, product information and other forms of corporate advertisement or merchantability that:
    (a) "3M™ One-Piece GPS Offender Tracking System ... can efficiently track offenders virtually anywhere, anytime..."
    (b) "The One-Piece GPS tracking System offers a robust integration of tracking, communication and mapping technologies..."

(c) "The system design is based on a widely used one-piece offender tracking system, successfully supporting dozens of government agencies…"

(d) Each monitored offender is assigned a One-Piece GPS tracking unit, which continuously tracks them in real-time."

(e) Relevant violations are communicated to offenders in addition to designated program administrators and officers."

(f) Offenders can be seamlessly switched from one level to the other."

(g) "Interchangeability… enable(s) the seamless transfer of offenders across different programs and monitoring applications for efficient case and resource management."

(h) "3M Electronic Monitoring is a global provider of leading presence and location verification technologies, designed for monitoring individuals in the law enforcement, corrections and security markets."

(i) "The integration of 3M Electronic Monitoring systems… is proven to be cost effective and reliable."

(j) "The Company's strategy is to focus on the provision of superior technology solutions…"

3. 3M is the manufacture and merchant or vendor in its sales, marketing, leasing, contracting or otherwise vending of the product, directly or indirectly, through the Probation Department, and is equivalent to an auto manufacturer selling its vehicles to dealers who then sell or lease them to the consumer.

4. The Plaintiff is the consumer of the 3M product, and paid a fee to use of the product.

5. The Plaintiff's use of the product was foreseeable as a condition of his probation and his use "fit for the ordinary purposes for which such goods are used."

6. The Plaintiff used the product per ELMO and Probation instruction.

7. The product is defective, flawed, inaccurate or unreliable contrary to the manufacturer.

8. The product has design or manufacturing defects or flaws that render the product inaccurate or unreliable and has resulted in governments, agencies and officials within the Commonwealth of Massachusetts and across the United States to ban its use.

9. 3M failed to warn its customers and partners about the dangers or defects of the product that are known or obvious to 3M.

10. The defect was a proximate cause of the plaintiff's injury.

11. And as a consequence, Plaintiff was falsely or wrongfully damaged or injured, thereby maliciously deprived or denied his constitutional, federal, state and statutory rights to liberty and pursuit of happiness, and consequently damaged by loss of time; economic or financial loss; health and medical expenses; impairment of employment offers and opportunities; impairment of educational offers and opportunities; impairment of earning capacity; pain and suffering; emotional distress; loss of consortium; and actual, compensatory, consequential, punitive or exemplary damages.

WHEREFORE, Plaintiff demands judgment, for the violation of state civil rights, against the Defendant, for actual, general, special, compensatory damages in the amount of $29,684.50 and further demands judgment against said Defendant, for punitive or exemplary damages in the amount of $500,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just, fair and appropriate.

## COUNT 2: NEGLIGENCE

1. Plaintiff repeats and re-alleges and incorporates by reference the facts aforementioned above with the same force and effect as is herein set forth.

2. 3M has a duty to exercise reasonable care in the sale, design and manufacture of the product.

3. The defendant's conduct is unreasonable as it continues to vend the product as advertised which contrary to facts within the Commonwealth of Massachusetts and across the United States.

4. The product is unreasonable dangerous or defective as it jeopardizes the individual consumer's constitutional rights to liberty and the pursuit of happiness as well as the enjoyment or exercise of other federal, statutory and state rights.

5. And as a consequence, Plaintiff was falsely or wrongfully damaged or injured, thereby maliciously deprived or denied his constitutional, federal, state and statutory rights to liberty and pursuit of happiness, and consequently damaged by loss of time; economic or financial loss; health and medical expenses; impairment of employment offers and opportunities; impairment of educational offers and opportunities; impairment of earning capacity; pain and suffering; emotional distress; loss of consortium; and actual, compensatory, consequential, punitive or exemplary damages.

WHEREFORE, Plaintiff demands judgment, for the violation of state civil rights, against the Defendant, for actual, general, special, compensatory damages in the amount of $29,684.50 and further demands judgment against said Defendant, for punitive or exemplary damages in the amount of $500,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just, fair and appropriate.

COUNT 3: CHAPTER 93A

1. Plaintiff repeats and re-alleges and incorporates by reference the facts aforementioned above with the same force and effect as is herein set forth.

2. Pursuant to G.L. c. 93A, sec ©, "It shall be unfair and deceptive to act or practice to fail to perform or fulfill any promise or obligations arising under a warranty."

3. 3M advertises the product as 'continuously tracking" "efficiently virtually anywhere, anytime…"

4. The product failed multiple times as aforementioned.

5. The product was replaced multiple times as aforementioned.

6. The product failed after replacement multiple times as aforementioned.

7. And as a consequence, Plaintiff was falsely or wrongfully damaged or injured, thereby maliciously deprived or denied his constitutional, federal, state and statutory rights to liberty and pursuit of happiness, and consequently damaged by loss of time; economic or financial loss; health and medical expenses; impairment of employment offers and opportunities; impairment of educational offers and opportunities; impairment of earning capacity; pain and suffering; emotional distress; loss of consortium; and actual, compensatory, consequential, punitive or exemplary damages.

WHEREFORE, Plaintiff demands judgment, for the violation of state civil rights, against the Defendant, for actual, general, special, compensatory damages in the amount of $29,684.50 and further demands judgment against said Defendant, for punitive or exemplary damages in the amount of $500,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just, fair and appropriate.

COUNT 4: MISREPRESENTATION

1. Plaintiff repeats and re-alleges and incorporates by reference the facts aforementioned above with the same force and effect as is herein set forth.

2. The defendant acted in the course of business.

3. The defendant supplied false information about the accuracy or reliability of its product.

4. The defendant failed to exercise reasonable care or competence of a reasonable person in the vending of an obvious or known flawed or defective product.

5. The false information provided by 3M, directly through its advertisements and promotions, and indirectly through its partners and customers, caused pecuniary loss.

6. The plaintiff justifiably relied on information that is false to pay for the use of the product to his own detriment.

7. The plaintiff voluntarily requested to pay for the use of the product to ensure his own safety, security and liberty, and had no expectation that its use would endanger the very rights that he sought to safeguard.

8. The defendant has a duty to disclose the defects, flaws, inaccuracy or unreliability of the product in the interest of the individual consumer or user as well as for the public good.


Respectfully submitted,

Daniel E. Sullivan, III

2 South Gateway

Winchester, MA 01890

617-448-7718